### UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 22-cr-150 (DWF/TNL) |
| Plaintiff, | |
| v. | **REPORT & RECOMMENDATION** |
| Alberto Chavez-Torres, | |
| Defendant. | |

Thomas M. Hollenhorst, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for the Government); and

Shannon R. Elkins, Office of the Federal Defender, 300 South Fourth Street, Suite 107, Minneapolis, MN 55415 (for Defendant).

## I. INTRODUCTION

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant Alberto Chavez-Torres' Pretrial Motion to Suppress Statements, Admissions, and Answers, ECF No. 22. This motion has been referred to the undersigned for a report and recommendation to the district court, the Honorable Donovan W. Frank, District Judge of the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. Local Rule 72.1.

The Court held a hearing on the motion on March 3, 2023. ECF No. 30. Assistant United States Attorney Thomas M. Hollenhorst appeared on behalf of the United States of America (the "Government"). Attorney Shannon R. Elkins appeared on behalf of Defendant.

At the March 3 hearing, the Court heard testimony from Minnesota State Patrol Trooper Anthony Mains and Drug Enforcement Administration ("DEA") Special Agent Connie Gerten. The Government offered and the Court received: Government Exhibit 1, Trooper Mains' squad car video; Government Exhibit 2, Trooper Scott Schneider's squad car video; and Government Exhibit 3, a Voluntary Consent to Search form dated September 18, 2019.

Post-hearing briefing is now complete, and this motion is ripe for a determination by the Court.

## II. FINDINGS

Based upon the file and documents contained therein, along with the testimony and exhibits presented, the undersigned Magistrate Judge makes the following findings.

### A. Trooper Anthony Mains

Trooper Anthony Mains is a licensed peace officer and has been a law enforcement officer for approximately ten years. Tr. 13:1-10, ECF No. 32.[1] He currently works as a trooper with the Minnesota State Patrol, and his duties include responding to calls on Minnesota roadways and assisting allied agencies. Tr. 12:18-13:16.

#### 1. Initial Information

On September 18, 2019, Trooper Mains was on duty and was contacted by a task force agent. Tr. 13:17-24. The task force agent told Trooper Mains about a vehicle

---

[1] Although the transcript has been temporarily sealed to allow for the process of redacting any personal identifiers, *see generally* D. Minn. LR 5.5, any notice of intent to request redaction was due March 21, 2023, and no such notice was filed. ECF No. 32. Instead, Defendant filed a "Notice That No Redaction is Required," stating he would "not be requesting redaction as no redaction is required." ECF No. 33.

traveling in a particular location that had a large quantity of narcotics inside of it.  Tr. 13:24-25:1, 50:4-7.  The task force agent described the vehicle as a white Chevy Silverado with Texas tags pulling an empty car dolly.  Tr. 14:12-18, 50:8-10.  The task force agent instructed Trooper Mains to locate the vehicle and stop it.  Tr. 49:19-20.

### 2.  The Stop

At about 10:32 a.m., Trooper Mains observed the Chevy Silverado traveling westbound on Highway 13 near Portland Avenue in Burnsville, Minnesota.  Tr. 14:5-22. Trooper Mains followed the vehicle and observed it committing traffic violations.  Tr. 14:23-25, 15:13-14, 49:21-22; *see also* Gov't Ex. 1 at 00:30-04:37.  According to Trooper Mains, the Chevy Silverado and the car dolly crossed over the right fog line multiple times. Tr. 15:15-18, 17:2-6, 50:17-19.  At one point, the car dolly went approximately two feet over the fog line.  Tr. 15:18-19.  Trooper Mains also observed the Chevy Silverado speeding, at one point clocking the vehicle going 62 miles per hour in a 55 mile per hour zone.  Tr. 16:8-24, 50:20-23.

Trooper Mains activated his emergency lights and signaled to the Chevy Silverado to stop.  Tr. 17:7-9; *see also* Gov't Ex. 1 at 04:37-04:53.  The vehicle pulled over quickly to the right shoulder.  Tr. 17:10-12.  Trooper Mains testified that the stop was pretextual and he "found a reason to stop" the vehicle.  Tr. 49:23-50:3.

### 3.  Initial Contact with Defendant

Trooper Mains approached the passenger side of the Chevy Silverado.  Tr. 17:12-14.  When Trooper Mains got up to the passenger window, the driver, later identified as

3

Defendant, motioned for Trooper Mains to open the door because he could not open the window. Tr. 17:14-16.

Trooper Mains opened the passenger door, asked Defendant how it was going, and asked Defendant if he had his license and proof of insurance. *See* Gov't Ex. 1 at 05:20-05:27. After looking at Defendant's license, Trooper Mains asked Defendant where "Edinburg" is, and he responded, "Way down in Texas, right by the border, in Mexico." *See* Gov't Ex. 1 at 05:38-06:05. Trooper Mains then began having "casual conversation" with Defendant, asking him where he was coming from, where he was going, and what he was doing in Minnesota. Tr. 17:16-18:3. Defendant handed Trooper Mains an advertisement from a vehicle auction business in Ham Lake, Minnesota, and said he was going to pick up the vehicle that was listed on the advertisement. Tr. 18:2-20. According to Trooper Mains, the advertisement showed a picture of a 2013 Dodge Dart "in pretty rough shape," as the front end of the Dodge Dart "was completely smashed up." Tr. 18:21-19:3, 20:9-11. Trooper Mains asked Defendant why he was "going this way," westbound on Highway 13, to get to Ham Lake. *See* Gov't Ex. 1 at 06:53-06:54. Trooper Mains also told Defendant, "That's a long drive just to get this car." Tr. 53:7-8.

Trooper Mains testified that he found Defendant's story about picking up the Dodge Dart to be "odd" for several reasons. Tr. 19:4-6.

First, Trooper Mains noticed that Defendant's cell phone GPS showed that he was five minutes away from his destination, and Trooper Mains knew from experience that Ham Lake was approximately an hour from their current location. Tr. 19:8-12.

4

Second, Trooper Mains found it strange that someone would make a 3,000-mile roundtrip drive from Texas to Minnesota to pick up a vehicle in such rough condition and worth only $1,100.  Tr. 20:3-8, 25:7-10.

Third, the car dolly being pulled by the Chevy Silverado was in "really rough shape," and did not look like it would be able to haul a full-size sedan all the way back to Texas.  Tr. 24:11-18.  According to Trooper Mains, a car dolly is often used by drug organizations so that "people can easily distance themselves from the contents of the [dolly]."  Tr. 25:11-18.

Fourth, the car dolly was empty and not hauling anything, so Defendant would not have made any money by hauling the dolly.  Tr. 24:18-21.

Fifth, the license plates on Defendant's Chevy Silverado registered to Edinburg, Texas, which Trooper Mains knows from experience to be situated right on the border of Mexico.  Tr. 20:18-23.  Trooper Mains also knows Edinburg to be a "drug source area" where drugs are manufactured and then brought across the border.  Tr. 20:24-21:3.

Sixth, Trooper Mains observed three cell phones, one of which appeared brand new, in the front seat of Defendant's Chevy Silverado.  Tr. 25:19-26:7.  Trooper Mains testified that people who are engaged in criminal activity will commonly have multiple cell phones, one for personal use and the others for illicit purposes.  Tr. 26:8-15.

Seventh, Trooper Mains observed multiple air fresheners scattered throughout Defendant's Chevy Silverado.  Tr. 23:9-1.  According to Trooper Mains, people with multiple air fresheners throughout their vehicle are typically "trying to cover up the odor of either freshly-consumed alcohol or illegal contraband."  Tr. 23:23-24:1.

5

Eighth, Defendant told Trooper Mains that he started driving the Chevy Silverado from Texas to Minnesota on Sunday, September 15, but the DEA database shows that the vehicle crossed the United States-Mexico border at about noon on Monday, September 16. Tr. 32:21-33:24. Further, another data point shows that the Chevy Silverado was in Kansas at about 11:30 p.m. on Tuesday, September 17, meaning the trip appeared to be about two days rather than the four days Defendant claimed to be traveling. Tr. 33:6-15. He also said he had only made one stop the whole time he was traveling. Tr. 21:20-22, 22:5-23:4.

Lastly, Defendant told Trooper Mains that he was "probably to pay $1,300 for the vehicle," but later mentioned that the payment had already been made by someone else, even though the advertisement showed that the vehicle had not yet been bid on. Tr. 35:18-36:6.

In light of these circumstances, Trooper Mains believed that Defendant was using the story of picking up a vehicle from Ham Lake as a cover story to transport drugs. Tr. 36:7-10. According to Trooper Mains, drug smugglers and organizations—and criminals in general—use cover stories when encountered by law enforcement to camouflage their destinations or what they are up to. Tr. 36:11-16. These stories are sometimes manufactured prior to police stops in anticipation of getting stopped by law enforcement. Tr. 36:17-20.

### 4. Further Contact with Defendant in Trooper Mains' Squad Car

Trooper Mains asked Defendant to get out of his Chevy Silverado, saying, "All right man. I'm just going to have you hop out, sit with me, give you a warning and get you out of here, okay? Come back with me." Tr. 26:18-20, 27:8-10, 53:18-22; *see also* Gov't Ex.

1 at 08:03-08:09. According to Trooper Mains, he planned to "continue the traffic stop" and "ask [Defendant] more questions." Tr. 27:11-14. He testified that Defendant spoke broken English and it was hard to hear him because of the passing traffic. Tr. 27:14-18, 31:2-11. Trooper Mains asked Defendant to come to his squad car and sit in the front passenger seat. Tr. 28:19-21. Defendant did so and was cooperative. Tr. 28:22-25.

Trooper Mains continued asking Defendant "casual questions" and began running his information. Tr. 29:1-4. Trooper Mains testified that at the time of the traffic stop in September 2019, it was not unusual for him to have a person sit in his front seat. Tr. 29:5-17. Trooper Mains asked Defendant clarifying questions about his trip from Texas to Minnesota, such as when he left Texas, when he had last been to Mexico, when he had last been to Minnesota, and how much he was getting paid. Tr. 30:1-16, 32:16-19. Defendant also told Trooper Mains about his family and personal life, acting friendly and sometimes laughing with Trooper Mains. Tr. 29:23-30:1; *see also* Gov't Ex. 1 at 10:20-12:15. According to Trooper Mains, Defendant seemed "very" conversational throughout the encounter. Tr. 30:17-20. He did not appear to feel threatened, and instead appeared to be relaxed. Tr. 30:21-24.

Trooper Mains informed Defendant that he was stopped for speeding and weaving over the fog line. Tr. 32:4-6, 54:8-11; *see also* Gov't Ex. 1 at 12:29-12:53. According to Trooper Mains, he did not tell Defendant that a task force agent had contacted him about narcotics being inside the vehicle because this was a wall-off stop. Tr. 61:13-14. Trooper Mains testified that a wall-off stop occurs when a traffic stop is conducted using information from another agency's investigation without sharing that information with the

suspect. Tr. 60:22-61:9. The purpose is to keep the nature of the investigation hidden from the target of the investigation and protect the other agency's investigation. Tr. 61:5-12.

Trooper Mains generated a written warning for speeding and unsafe lane use. Tr. 36:21-24; *see also* Gov't Ex. 1 at 20:45-20:48. Trooper Mains printed out the warning and told Defendant that he had to ask him another question. Tr. 36:25-37:11; *see also* Gov't Ex. 1 at 22:14-22:15. Trooper Mains testified that he decided to extend the stop and ask additional questions because he believed there was criminal activity occurring, and he had reasonable articulable suspicion that Defendant was smuggling narcotics. Tr. 37:12-38:7. According to Trooper Mains, Defendant was not in custody at this point and was not in handcuffs. Tr. 39:1-4. Trooper Mains did not tell Defendant that he was under arrest. Tr. 39:5-8. Trooper Mains testified that Defendant was relaxed and there was nothing that Defendant did or said that led Trooper Mains to believe that Defendant thought he was under arrest. Tr. 39:14-18. Trooper Mains testified that he considered the additional questions to be consensual. Tr. 39:19-20.

### 5. Consent to Search Defendant's Vehicle and Dolly

Trooper Mains told Defendant that some of what he has been saying is not making sense. *See* Gov't Ex. 1 at 22:17-22:20. Trooper Mains told Defendant that there have been a lot of drugs coming up and down Interstate 35. *See* Gov't Ex. 1 at 22:20-22:25. He then said,

| | |
|---|---|
| Trooper Mains: | I'm going to ask you straight out. Are you transporting any illegal narcotics today? |
| Defendant: | No. |

| | |
|---|---|
| Trooper Mains: | No?  No methamphetamine? |
| Defendant: | No. |
| Trooper Mains: | Any marijuana? |
| Defendant: | No.  You wanna search my truck?  That's fine. |
| Trooper Mains: | Ok.  Any cocaine? |
| Defendant: | No sir. |

*See* Gov't Ex. 1 at 22:27-22:43; *see also* Tr. 39:22-40:2, 41:24-42:5, 54:17-19.  According to Trooper Mains, when he mentioned methamphetamine and cocaine, Defendant gasped, held his chest, and appeared to get nervous.  Tr. 40:5-9, 41:16-23.  Trooper Mains then asked Defendant if he had large amounts of U.S. currency or other drugs like ecstasy, molly, and MDMA, and Defendant said no to having each one.  *See* Gov't Ex. 1 at 22:43-23:02.  Defendant stated that he does not drink or do drugs, and he only came to Minnesota to pick up the Dodge Dart.  *See* Gov't Ex. 1 at 23:02-23:32.

Trooper Mains then asked Defendant, "Can I search your vehicle?" and Defendant responded, "Sure. Why not."  *See* Gov't Ex. 1 at 23:32-23:37; *see also* Tr. 40:4, 42:6-12, 54:25-55:2.  Trooper Mains asked Defendant if he could sign a voluntary consent to search form and went through the form with Defendant.  Tr. 42:25-43:2, 55:3-4; *see also* Gov't Ex. 3.  Trooper Mains asked Defendant if he could read English, and Defendant responded affirmatively.  Tr. 55:12-17; *see also* Gov't Ex. 1 at 26:09-26:15.  Trooper Mains told Defendant to read the form and explained that he was going to search the Chevy Silverado

and dolly.  *See* Gov't Ex. 1 at 26:15-26:26; *see also* Tr. 43:11-14.  Defendant signed the form and then Trooper Mains signed it.  Tr. 43:15-19; *see also* Gov't Ex. 3.

Defendant told Trooper Mains that his stomach is loose.  *See* Gov't Ex. 1 at 27:31-28:23.  Trooper Mains had Defendant move to the back seat of the squad car with the door open.  Tr. 55:18-56:2; *see also* Gov't Ex. 1 at 28:32-29:05.

### 6.  The Search

Trooper Mains' partner, Trooper Scott Schneider, who was already on scene, conducted an exterior sniff of the Chevy Silverado and the car dolly with his drug detection canine, "Ko."  Tr. 43:20-25, 44:15-19; *see also* Gov't Ex. 1 at 29:53-31:28; Gov't Ex. 2 at 22:38-24:12.  While Ko was sniffing the vehicle and dolly, Trooper Mains asked Defendant if Ko was going to find anything or if he had ever had drugs in there before.  *See* Gov't Ex. 1 at 30:06-30:11.  Defendant said no.  *See* Gov't Ex. 1 at 30:11-30:12.

Ko then "alerted" to the body of the dolly as well as the rear bumper of the Chevy Silverado, indicating the presence of narcotics in those areas.  Tr. 45:8-46:1.  At that point, Trooper Mains decided to do a full search of the vehicle and dolly at the scene of the traffic stop.  Tr. 46:2-7.  Before searching the vehicle, Trooper Mains asked Defendant if the Chevy Silverado, car dolly, and everything inside belonged to him, and Defendant confirmed that it did.  Tr. 47:4-9, 56:3-14; *see also* Gov't Ex. 1 at 32:28-32:38.

Trooper Mains and Trooper Schneider searched the Chevy Silverado and the car dolly.  *See* Gov't Ex. 1 at 32:38-01:17:00; Gov't Ex. 2 at 25:38-1:09:48.  They ultimately found roughly four kilograms of cocaine in eight separate bundles inside the dolly's axle housing.  Tr. 46:12-15.  The narcotics were located roughly an hour and five minutes after

the stop initially occurred. Tr. 47:17-23; *see also* Gov't Ex. 1 at 01:06:00-01:08:25. Defendant was placed under arrest and transported to the Scott County Jail. *See* Gov't Ex. 1 at 1:08:33-1:08:45, 1:22:49-1:37:53.

Trooper Mains testified that he called the task force agent he had spoken with earlier in the day and informed them that he had located the narcotics. Tr. 57:23-25.

**B. Special Agent Connie Gerten**

Special Agent Connie Gerten is a federal peace officer and has been a DEA agent for approximately 13 years. Tr. 62:11-63:5. The general nature of her duties include investigating large-scale drug trafficking organizations. Tr. 63:6-8.

**1. Investigation**

In June 2019, DEA agents started working with a confidential informant ("CI") who was coordinating with target members in Texas regarding a cocaine load that was being brought from Texas to Minnesota. Tr. 64:1-5.

On September 17, 2019, one of the target members in Texas contacted the CI and informed him that a cocaine load was in route to Minnesota. Tr. 66:13-15. The target member provided the CI with the phone number of the courier, which the CI then passed on to DEA agents. Tr. 67:2-23. Later that night, the courier texted the CI and asked where to meet. Tr. 68:10-24. Law enforcement told the CI to tell the courier to meet at the Days Inn on Erin Drive in Eagan, Minnesota. Tr. 69:11-70:4.

On September 18, 2019, law enforcement got a "tracker warrant" for the courier's phone number. Tr. 70:5-12. Law enforcement started receiving GPS data from the courier's phone that morning. Tr. 70:21-71:4. At that time, the courier's location was on

Interstate 35 near Elko New Market, Minnesota.  Tr. 71:5-16.  About a half hour later, Special Agent Gerten was on surveillance at the Days Inn and observed a Chevy Silverado with Texas plates pulling a car dolly arrive at the Days Inn.  Tr. 71:18-21, 84:23-25.  There was one person in the vehicle at the time.  Tr. 72:2-4.

Later that morning, agents observed the Chevy Silverado drive over to a McDonald's, which was a short distance away from the Days Inn.  Tr. 72:7-10, 85:4-5.  The driver, later identified as Defendant, exited the vehicle, went into the McDonald's, and returned to the vehicle a short time later.  Tr. 72:10-16.  About ten minutes later agents directed the CI to send a text message to the courier's phone number providing a location in Savage, Minnesota to do the exchange.  Tr. 72:17-23.  Agents determined that the Days Inn was no longer a sufficient location for the exchange because agents "needed the courier to change locations to initiate a traffic stop."  Tr. 72:24-73:5.  A short time later, Defendant left the McDonalds and began traveling towards Savage, Minnesota.  Tr. 73:6-12.

Special Agent Gerten testified that either she or another one of the agents assisting her asked Trooper Mains to stop the Chevy Silverado.  Tr. 73:16-21, 85:6-11.

After Trooper Mains stopped Defendant's Chevy Silverado, Special Agent Gerten was informed that officers located cocaine.  Tr. 73:22-25.  According to Special Agent Gerten, they did not discuss what was said during the traffic stop.  Tr. 73:25-74:1, 87:7-9.  All she knew was that eight bundles of cocaine weighing approximately four kilograms was found in Defendant's dolly.  Tr. 75:8-14.  She had not read or received any written reports from Trooper Mains or Trooper Schneider.  Tr. 74:2-5.

### 2. Interview with Defendant

The day after the traffic stop, on September 19, 2019, at approximately 7:22 p.m., Special Agent Gerten and Dakota County Drug Task Force Officer Dahmes interviewed Defendant at the Scott County Jail. Tr. 75:21-76:9.  Neither officer was armed, and both were dressed in plain clothes wearing jeans and a shirt.  Tr. 77:22-78:3.

Special Agent Gerten and Officer Dahmes interviewed Defendant in a small, less than 8x8-foot interview room at the jail.  Tr. 77:14-21, 78:4-10.  When Defendant was brought into the interview room, Special Agent Gerten got a Spanish interpreter on the phone and put her on speaker.  Tr. 78:23-79:5, 87:24-88:4.  Special Agent Gerten and Officer Dahmes spoke in English, Defendant spoke in Spanish, and the interpreter provided interpretation services from English to Spanish and Spanish to English.  Tr. 79:6-14. According to Special Agent Gerten, there did not seem to be any communication issues. Tr. 79:2-24.

The interview was not recorded.  Tr. 77:7-8, 88:8-10.  According to Special Agent Gerten, Department of Justice and DEA policies did not require her to record the interview. Tr. 77:4-6.  Special Agent Gerten testified that the room they interviewed Defendant in was not set up for audio recording.  Tr. 77:9-13.  Additionally, Special Agent Gerten testified that she did not bring her handheld recorder with her and did not use her cell phone to record the interview.  Tr. 91:16-25.

At approximately 7:25 p.m., Special Agent Gerten read Defendant his *Miranda* rights:

> Before we ask you any questions, you must understand you have the right to remain silent. Anything you say can be used against you in court.
>
> You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
>
> Do you understand?
>
> Are you willing to answer some questions?

Tr. 80:2-25, 88:20-22. She testified that it is "very likely" that she also gave Defendant a copy of the *Miranda* rights written in Spanish to read because it is her common practice to do so, though she could not recall specifically whether she did so in this case. Tr. 81:14-18. According to Special Agent Gerten, Defendant responded affirmatively to both questions. Tr. 81:1-5. Special Agent Gerten testified that there was no confusion about Defendant's *Miranda* rights. Tr. 81:7-9. She did not have Defendant sign a written *Miranda* waiver. Tr. 88:23-25.

According to Special Agent Gerten, there was nothing out of the ordinary about Defendant's demeanor during the interview. Tr. 81:20-24. He did not appear to be under the influence of anything and appeared to be the "normal amount" of upset compared to any other person in custody. Tr. 81:25-82:6. Special Agent Gerten testified that Defendant seemed to follow and track the questions that were being asked, and his responses seemed to track what was being asked. Tr. 82:8-13. Further, she testified that Defendant's answers all "made sense," he appeared to understand the nature of what was going on, and he never asked to speak with an attorney. Tr. 82:14-15, 83:22-84:2. Additionally, Defendant never

complained about being uncomfortable in the location of the interview.  Tr. 82:18-21.

Special Agent Gerten did not recall whether Defendant asked for water or stated that he

needed to go to the bathroom, but she testified that she would have granted him such

permission if he would have asked.  Tr. 82:18-83:3.

According to Special Agent Gerten, Defendant made some incriminating

statements, but more so conflicting statements and "things that didn't make sense."  Tr.

83:13-16.  After about an hour, Special Agent Gerten and Officer Dahmes finished their

questioning and ended the interview.  Tr. 83:7-8, 84:3-6.

### III. CONCLUSIONS OF LAW

Based upon the foregoing findings, the undersigned makes the following

conclusions of law.

Defendant moves to suppress his statements, admissions, and answers (1) to Trooper

Mains at the scene of the arrest on September 18, 2019, and (2) to Special Agent Gerten

and Officer Dahmes at the Scott County Jail on September 19, 2019.  ECF No. 22.

Defendant contends that his statements to Trooper Mains were made in violation of

*Miranda* and must be suppressed.  Def.'s Mem. in Supp. at 6, ECF No. 34.  Defendant also

contends that his statements to Special Agent Gerten and Officer Dahmes must be

suppressed because the Government did not meet its burden to show that his *Miranda*

waiver was knowing and intelligent.

### A.  Statements to Trooper Mains

As the Government points out, Defendant does not move to suppress any physical

evidence seized by law enforcement as a result of the traffic stop.  Nor does Defendant

claim that the stop was impermissibly extended. *See* Gov't's Mem. in Opp. at 9. Instead, Defendant moves to suppress his statements to Trooper Mains because he was not advised of his *Miranda* rights during custodial interrogation. *See* Def.'s Mem. in Supp. at 8-12. The Government contends that *Miranda* warnings were not required because Defendant was not in custody when being questioned by Trooper Mains.[2] *See* Gov't's Mem. in Opp. at 10-11, ECF No. 38.

### 1. Pre-Dog Sniff Alert Statements

An individual's *Miranda* protections are triggered "only when the [individual] is both in custody and being interrogated." *United States v. Lawrence*, 952 F.2d 1034, 1036 (8th Cir.), *cert. denied*, 503 U.S. 1011 (1992); *accord Miranda v. Arizona*, 384 U.S. 436 (1966). "Although stopped drivers are detained, they are generally not in custody during the roadside questioning that is permitted during a traffic stop." *United States v. Soderman*, 983 F.3d 369, 376 (8th Cir. 2020) (citing *Berkemer v. McCarty*, 468 U.S. 420, 439-40 (1984)). During the traffic stop, *Miranda* applies only when and if the "suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" *Berkemer*, 468 U.S. at 440-41 (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curium)). In other words, the "critical inquiry is [] whether the [d]efendant's freedom to depart was restricted in any way." *United States v. Martinez*, 462 F.3d 903, 909 (8th Cir. 2006).

In *United States v. Griffin*, the Eighth Circuit set out six non-exhaustive factors for

---

[2] The Government notes that it will not offer any statements in its case-in-chief made by Defendant on September 18, 2019, "following the dog sniff." *See* Gov't's Mem. in Opp. at 6. As such, the Court separates its discussion into (1) statements made by Defendant before Ko alerted to the presence of narcotics, and (2) statements made by Defendant after Ko alerted to the presence of narcotics.

courts to consider when determining whether an individual was in custody at the time of questioning:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning.

922 F.2d 1343, 1349 (8th Cir. 1990). "The first three indicia are mitigating factors which, if present, mitigate against the existence of custody at the time of questioning. Conversely, the last three indicia are aggravating factors which, if present, aggravate the existence of custody." *United States v. Axsom*, 289 F.3d 496, 501 (8th Cir. 2002).

Importantly, whether someone is in custody "cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." *Czichray*, 378 F.3d at 827. The *Griffin* factors are "simply a rubric for considering the ultimate issue, not a mandatory checklist[.]" *United States v. Perrin*, 659 F.3d 718, 720 (8th Cir. 2011). The ultimate question remains whether, under the totality of the circumstances, Defendant felt he was at liberty to terminate the interrogation and leave. *Id.* (citing *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2402 (2011)).

After careful review of the record, the Court determines that Defendant's motion to suppress statements to Trooper Mains should be denied because he was not in custody

when he was questioned in the squad car. Accordingly, his statements to Trooper Mains need not be suppressed.

With respect to the first *Griffin* factor, Defendant argues that "Trooper Mains never informed [him] that the questioning was voluntary, that he was free to leave or free to ask the officers to leave, or that he was not considered under arrest." *See* Def.'s Mem. in Supp. at 8.

"The most obvious and effective means of demonstrating that a suspect has not been taken into custody . . . is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." *Williams*, 769 F.3d at 814 (quoting *Griffin*, 922 F.2d at 1349). However, even if the police fail to inform the suspect that questioning is voluntary and he is free to leave, "'the opposite inference'—that a suspect not being told he is free to leave during police questioning is a strong indication he was in custody—does not necessarily follow, because 'the touchstone of [the Court's] inquiry remains whether [the suspect] was restrained as though he were under formal arrest.'" *United States v. Laurita*, 821 F.3d 1020, 1024 (8th Cir. 2016) (quoting *United States v. Lowen*, 647 F.3d 863, 868 (8th Cir. 2011)).

Here, the first *Griffin* factor does not weigh heavily in the Court's analysis. The first factor does not mitigate against a finding of custody because there is no evidence in the record that Defendant was told that the questioning was voluntary, that he was free to leave, or that he was not considered under arrest. On the other hand, there is no evidence in the record that Trooper Mains told Defendant he was required to answer questions. Further, Trooper Mains never told Defendant that he would be detained after the stop

concluded. *See Soderman*, 983 F.3d at 377 ("Throughout the stop, [the trooper] . . . at no time said that [the defendant] would continue to be detained after the stop concluded."). In fact, Trooper Mains told Defendant that he would only issue him a warning for the traffic violations and get Defendant "out of here." *See* Gov't Ex. 1 at 08:03-08:09 ("All right man. I'm just going to have you hop out, sit with me, give you a warning and get you out of here."), 20:45-20:47 ("Let me get your warning here."), 21:00-21:03 ("So I'm gonna warn you for the speed."), 22:02-22:06 ("So like I said, just a warning for the speed and unsafe lane usage."), 22:10-22:13 (Defendant asking, "Don't have to pay for that?" and Trooper Mains responding, "Nope. Don't gotta pay for that."). Thus, the first *Griffin* factor is neutral. *See Soderman*, 983 F.3d at 372-73, 377 (concluding that interview in trooper's squad car was not custodial even though the record does not reflect that the trooper told the defendant that questioning was voluntary or that he was not under arrest); *Laurita*, 821 F.3d at 1024 ("Although [the investigators] did not expressly tell [the defendant] his participation was voluntary or that he was free to leave, nothing about the circumstances or the investigators' actions indicated otherwise."); *United States v. Mottl*, 946 F.2d 1366, 1370 (8th Cir. 1991) (finding that although officers did not tell the defendant he could terminate the interview at will or that they did not intend to arrest him, the remaining *Griffin* factors entitled the district court to find that the defendant was not in custody during the interview); *United States v. Detloff Marketing*, No. 18-cr-197 (PAM/HB), 2019 WL 3293470, at *6 (D. Minn. Apr. 18, 2019) ("[A]lthough it appears no one affirmatively told [the defendant] that he was free to leave or otherwise terminate the interview at any time, the Court finds from the totality of the circumstances that the first *Griffin* factor is neutral

in the overall custody determination."), *report and recommendation adopted*, 2019 WL 2511890 (D. Minn. June 18, 2019).

As for the second *Griffin* factor, whether the suspect possessed unrestrained freedom of movement during questioning, Defendant argues that his movement was restrained during questioning because he was placed in a squad car during the traffic stop. *See* Def.'s Mem. in Supp. at 9.  He notes that he complained about having a "loose stomach" but was not offered a bathroom or the option to stand outside the car, and he was not allowed to walk away from the traffic stop.  *See id*.

The Court cannot determine whether Defendant possessed "unrestrained freedom of movement during questioning" by Trooper Mains because he did not attempt to move about.  *See United States v. Sanchez*, 676 F.3d 627, 631 (8th Cir. 2012) (finding the second *Griffin* factor difficult to determine where the defendant did not attempt to leave because "it is unclear what would have happened if she had").  The Court does find, however, that Defendant's "freedom of action" as he sat in Trooper Mains' squad car's passenger seat was not "constrained to a degree associated with formal arrest."  *See Soderman*, 983 F.3d at 377.  Defendant walked voluntarily to Trooper Mains' squad car and got into the front seat on his own.  He was not handcuffed.  Nor was he forced to sit in the back seat until his vehicle was searched.  *See id*. ("[A]lthough [the trooper] asked [the defendant] to sit in the patrol car during the stop, [the defendant] was neither handcuffed nor forced to sit in the back seat" and therefore "retained a degree free movement . . . and was not constrained to the degree associated with formal arrest."); *United States v. Coleman*, 700 F.3d 329, 336 (8th Cir. 2012) (finding that the defendant "was not subjected to restraints comparable to

those of a formal arrest" when he was questioned in the front seat of the trooper's patrol car, was not handcuffed, and had not been told that his detention would be anything other than temporary); *United States v. Hoeffener*, 950 F.3d 1037, 1046 (8th Cir. 2020) (finding that the defendant was not in custody during in-vehicle questioning where the defendant was asked if he would sit in the front seat of the officer's vehicle and the defendant "willingly and voluntarily did so"). While Defendant mentioned having a "loose stomach," he never asked to get out of the squad car. *See Hoeffener*, 950 F.3d at 1046 ("At no time did [the defendant] ask to get out of the vehicle."). Thus, the factor weighs slightly in favor of a finding that Defendant was not in custody.

Defendant argues that the third *Griffin* factor, whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions, weighs in favor of finding that he was in custody. He argues that he only spoke with Trooper Mains because all citizens are required to comply with the commands and authority of a law enforcement officer. *See* Def.'s Mem. in Supp. at 10.

If law enforcement officials confront a suspect with questions, custody is more likely to exist. *Griffin*, 922 F.2d at 1351. However, the fact that a law enforcement official initiates contact with a suspect is not dispositive. *See United States v. Schoenborn*, No. 13-cr-149 (RHK/LIB), 2013 WL 5787659, at *5-6 (D. Minn. Oct. 28, 2013) (quoting *United States v. Axsom*, 289 F.3d 496, 501 (8th Cir. 2002) ("In considering the third mitigating factor, the district court correctly found that [the defendant] did not initiate or arrange for the questioning. However, the court failed to analyze the disjunctive prong of the third mitigating factor—*whether the defendant voluntarily acquiesced to requests by federal*

21

*agents to answer questions.*")); *see also Laurita*, 821 F.3d at 1025 (finding that although investigators initiated contact with the defendant, the record shows that the defendant voluntarily agreed to speak with the investigators). In considering voluntary acquiescence to requests by law enforcement to answer questions, courts can also consider the defendant's conduct during the interview. *Axsom*, 289 F.3d at 501-02 (finding the third mitigating factor present where the defendant was "extremely friendly and cooperative during the interview").

Here, when Trooper Mains asked Defendant to exit his vehicle and sit in the front seat of Trooper Mains' squad car, Defendant "willingly and voluntarily did so." *See Hoeffener*, 950 F.3d at 1046; *United States v. Johnson*, 39 F.4th 1047, 1051-52 (8th Cir. 2022) (finding that the defendant voluntarily acquiesced to the interview inside a squad car where he agreed to accompany the agents to their vehicle). Further, the Court's review of the audio recording of Defendant's statements to Trooper Mains leads the Court to conclude that Defendant voluntarily acquiesced to law enforcement request to answer questions. The recording shows that Defendant

> was friendly and cooperative throughout the interview, and did not hesitate to answer questions . . . . He did not exhibit any verbal or audible signs of stress in responding to questions, or reticence to answer the questions he was asked. Furthermore, [he] did not indicate at any point that he was interested in terminating the interview.

*See United States v. Skog*, No. 18-cr-85 (WMW/HB), 2018 WL 4938718, at *7 (D. Minn. Aug. 28, 2018), *report and recommendation adopted*, 2018 WL 4932866 (D. Minn. Oct. 11, 2018); *see also Axsom*, 289 F.3d at 502. Defendant was talkative and friendly to

Trooper Mains and laughed a few times throughout their conversation when sharing about his relationships and personal life. "[B]ecause the recording reflects [Defendant's] general willingness to answer the questions in the interview, the Court finds that the third *Griffin* factor weighs somewhat in favor of finding the interrogation was noncustodial." *See Skog*, 2018 WL 4938718, at *7.

With respect to the fourth *Griffin* factor, whether law enforcement used strong-arm tactics or deceptive stratagems during questioning, Defendant contends that "[t]here was a clear deception in the stop." *See* Def.'s Mem. in Supp. at 10. He argues that Trooper Mains told him that he was being stopped for speeding and failing to keep his trailer within his lane when, in fact, he was being stopped pretextually so officers could search his truck and trailer for drugs. *See id*. According to Defendant, he was deceived into sitting in Trooper Mains' squad car and answering questions. *See id*. at 10-11.

Strong-arm tactics include situations where police "adopt a threatening posture toward [the suspect], display their weapons, or make a physical show of force during questioning." *Skog*, 2018 WL 4938718, at *7 (quoting *Axsom*, 289 F.3d at 502). Strong-arm tactics and deceptive stratagems also include "confronting suspects with false or misleading witness statements, repeatedly lying to the suspect, or employing a good cop-bad cop routine." *Id*. (citing *United States v. Peterson*, No. 14-cr-328 (JRT/FLN), 2015 WL 1585507, at *7 (D. Minn. Apr. 2, 2015)). Police tactics are less likely to be considered strong-arm where police ask "straightforward questions" that elicit "straightforward answers." *See id*. (citing *Axsom*, 289 F.3d at 502). Under the fourth *Griffin* factor, the relevant inquiry is whether the officer's tactics or deception would cause a reasonable

23

person to "perceive the coercion as restricting his or her freedom to depart." *See United States v. LeBrun*, 363 F.3d 715, 721 (8th Cir. 2004).

The Court finds that Trooper Mains did not employ strong-arm tactics or deceptive stratagems during questioning.  Though Trooper Mains did not share that he and other officers suspected that Defendant was transporting drugs, such omission does not constitute deceit.  Any deceit that did exist in this case would not be perceived by a reasonable person as restricting his freedom to depart.  *See United States v. Elzahabi*, 502 F.Supp.2d 915, 922 (D. Minn. 2007) (citing *United States v. Beraun-Panez*, 812 F.2d 578, 581 (9th Cir. 1987) (finding that the defendant was in custody when a reasonable person could interpret the remarks of the officers as requiring the defendant to confess if the defendant was to avoid deportation)); *see also Berkemer*, 468 U.S. at 442 ("Although [the arresting officer] apparently decided as soon as [the defendant] stepped out of his car that he would be taken into custody and charged with a traffic offense, [the officer] never communicated his intention to [the defendant]. A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation."). The recording demonstrates that Trooper Mains' demeanor was not authoritative or imposing.  He spoke in a calm, friendly, and respectful manner to Defendant throughout their interaction.  The interactions between Trooper Mains and Defendant were conversational and free from intimidation.  In fact, Defendant was friendly, laughed, and made Trooper Mains laugh a few times throughout their conversation.  Further, Trooper Mains did not display his weapon, yell, or otherwise threaten Defendant. *See Schoenborn*,

2013 WL 5787659, at *6 (citing *Axsom*, 289 F.3d at 502). Nor did Trooper Mains make any promises to Defendant or use any deceptive stratagems, such as the good-cop, bad-cop routine. *See id.* (citing *United States v. Brown*, 990 F.2d 397, 400 (8th Cir. 1993) (finding no deceptive stratagems like the "good-cop, bad-cop routine"); *United States v. Carter*, 884 F.2d 368, 372 (8th Cir. 1989) ("Mutt and Jeff" technique contributed to police-dominated atmosphere)). Accordingly, this factor weighs in favor of finding that Defendant was not in custody.

The fifth *Griffin* factor is whether the overall atmosphere of questioning was police-dominated. When analyzing the fifth factor, courts consider the location and length of the questioning and whether police dictated the course of conduct for the suspect. *Griffin*, 922 F.2d at 1352. Courts also consider the number of law enforcement officers that participated in questioning the suspect. *Axsom*, 289 F.3d at 502.

Defendant argues that the atmosphere of the stop was police dominated because the questioning took place on Trooper Mains' "home turf," namely, in his squad car. *See* Def.'s Mem. in Supp. at 11. Defendant also points out that there were two police cars, two officers, and a drug dog present on the side of a busy highway, and Defendant was therefore "outnumbered and in police control." *See id.*

The Court finds that the atmosphere of questioning was not police dominated. The nature of a typical traffic stop is "substantially less" police dominated than other kinds of interrogations that are considered custodial for the purposes of *Miranda*. *Berkemer*, 468 U.S. at 438-39. In a typical traffic stop, "the detained motorist is confronted by only one or at most two policemen" in a public place. *Id.* at 438. These circumstances ensure that

the motorist does not feel "completely at the mercy of the police" and mute the motorist's "sense of vulnerability." *Id*. In this case, two officers were present throughout the duration of the traffic stop. *See Soderman*, 983 F.3d at 377 ("Although [the defendant] was temporarily detained, only two officers were present during the stop."). Further, only one officer, Trooper Mains, spoke with Defendant. Trooper Schneider arrived on scene with his K9 Ko to conduct the dog sniff, but never spoke with Defendant. Additionally, the interview was relatively short, and at no point did Defendant indicate he wished to be elsewhere or terminate the interview. And again, the tone of the conversation was relaxed, friendly, and conversational. While the questioning occurred in Trooper Mains' squad car, the atmosphere was not police dominated. *See United States v. Hephner*, 103 Fed. Appx. 41, 48-49 (8th Cir. 2004) (finding that the atmosphere was not police dominated where the trooper asked the defendant to exit his truck and sit in the trooper's patrol car).

Lastly, the sixth *Griffin* factor, whether the suspect was placed under arrest at the termination of the questioning, is present because Defendant was placed under arrest. This factor alone, however, does not establish that the interview was custodial. *See United States v. Giboney*, 863 F.3d 1022, 1028 (8th Cir. 2017) (citing *United States v. Flores-Sandoval*, 474 F.3d 1142, 1146-47 (8th Cir. 2007) (finding that the defendant was not in custody although he was arrested after being questioned by law enforcement).

This case is quite similar to the *Hephner* case referenced above. In *Hephner*, state troopers were notified by officers from another agency that a particularly-described truck, which was suspected to be carrying cocaine, would be passing through. *United States v. Hephner*, 260 F.Supp.2d 763, 767 (N.D. Ia. 2003), *aff'd* 103 Fed. Appx. 41 (8th Cir. 2004).

The officers directed the state troopers to "make [their] own case" and stop the truck. *Id*. The state troopers later located the truck and stopped it on the interstate, citing an excessively loud exhaust system. *Id*. at 768. The state trooper separated the driver and the passenger and asked them questions about where they had been and why they had been there. *Id*. The driver and passenger were directed to sit in separate state trooper squad cars. *Id*. One state trooper informed the driver that he was being given a warning for an excessively loud exhaust system. *Id*. The state trooper gave the driver the warning ticket and immediately thereafter asked the driver if he had anything illegal in the truck. *Id*. The driver replied that he did not. *Id*. He agreed to let the state troopers search his truck and signed the consent to search form. *Id*. Another trooper and K-9 officer came to the scene, and the K-9 gave a positive indication for narcotics inside the truck. *Id*. The truck was later searched, drugs were recovered, and the driver and passenger were arrested. *Id*. at 769. The passenger later argued that his statements should be suppressed because they were made while he was in custody and before receiving a *Miranda* warning. *Id*. at 778. The district court found that the passenger was not in custody and therefore denied his motion to suppress his statements. *Id*. at 778-79. The district court noted that "[t]he troopers never communicated to [the passenger] verbally that he was under arrest or that they wanted to arrest him," and concluded "that a reasonable man would, under these circumstances, believe only that he was being detained for investigation, and not being placed under arrest." *Id*. at 778.

Similarly, here, Trooper Mains never communicated to Defendant that he was under arrest, that officers wanted to arrest him, or that his detention would be anything other than

temporary. He was not handcuffed or forced to sit in the back seat of the squad car and therefore retained a degree of free movement and was not constrained to the degree associated with formal arrest. He voluntarily acquiesced to questioning and was friendly and cooperative throughout the interview. Though Defendant was arrested at the conclusion of the traffic stop, Trooper Mains did not employ strong-arm tactics or deceptive stratagems during questioning, and the atmosphere of questioning was not police dominated. Balancing the six *Griffin* factors and based on the totality of the circumstances surrounding Defendant's statements to Trooper Mains, the Court finds that Defendant was not in custody for *Miranda* purposes. Accordingly, to the extent Defendant moves to suppress statements made to Trooper Mains before Ko alerted to the presence of narcotics, the Court recommends that his motion be denied.

### 2. Post-Dog Sniff Alert Statements

As stated above, the Government notes that "[a]fter the dog alerted, Trooper Mains asked the defendant a few more questions," to which Defendant responded that "everything in the vehicle was his and that the truck and the trailer belonged to him." Gov't Mem. in Opp. at 6. According to the Government it "does not intend to offer these final statements in its case-in-chief or to offer any other statements in its case-in-chief made that day by the defendant following the dog sniff." *Id*.

In light of the Government's representation that it will not introduce the specific statements Defendant made to Trooper Mains after Ko alerted to the presence of narcotics, Defendant's motion to suppress these statements is moot. *See United States v. Morris*, No. 17-cr-107 (DWF/TNL), 2018 WL 2193109, at *9 (D. Minn. May 14, 2018) ("Accordingly,

Defendant's motion is denied as moot given the Government's representations that it does not intend to introduce evidence from the December 14, 2016 search and seizure in its case-in-chief."); *United States v. Tran*, No. 09-cr-172 (MJD/SRN), 2009 WL 10678912, at *16 (D. Minn. Oct. 9, 2009) ("[T]he Government states that it does not intend to introduce Defendant's responses . . . in its case-in-chief. Based on the Government's representations, the Court recommends that this motion be denied as moot."), *report and recommendation adopted*, 2009 WL 10678930 (D. Minn. Oct. 27, 2009); *United States v. Tenerelli*, No. 07-cr-194(1), 2008 WL 420018, at *2 (D. Minn. Feb. 13, 2008) (denying motion to suppress as moot based on the Government's representation that it did not intend to use any statements made by the defendant in its case-in-chief); *United States v. Torres*, No. 17-cr-194 (WMW/TNL), 2018 WL 1160667, at *3 (D. Minn. Jan. 11, 2018), *report and recommendation adopted*, 2018 WL 1158007 (D. Minn. Mar. 5, 2018) (same). Accordingly, to the extent Defendant moves to suppress statements made to Trooper Mains after Ko alerted to the presence of narcotics, the Court recommends that his motion be denied as moot.

### B. Statements to Special Agent Gerten and Officer Dahmes

Defendant argues that his statements to Special Agent Gerten and Officer Dahmes at the Scott County Jail should be suppressed because he did not make a knowing and voluntary waiver of his *Miranda* rights.[3] *See* Def.'s Mem. in Supp. at 16. Defendant

---

[3] Defendant also argues that this statements should be suppressed as "fruit of the first illegally obtained [] statement" because Trooper Mains failed to give Defendant his *Miranda* warning during custodial interrogation. *See* Def.'s Mem. in Supp. at 12-16. In light of the Court's recommendation to deny Defendant's motion to suppress statements to Trooper Mains, the Court declines to address this argument.

argues that because Special Agent Gerten did not record the interview or go through a written *Miranda* waiver form with him, "[n]obody except Agent Gerten, [Officer Dahmes], the interpreter, and [Defendant] will ever know exactly what happened in that interrogation room and what [Defendant] understood versus what [he] did not understand." *See id*. at 17. Thus, Defendant contends that the Government has not met its burden to show that Defendant's *Miranda* waiver was voluntary and that he understood those rights. *See id*. at 16-17. The Government argues that "there was nothing about the interview, or the police actions that preceded it, that would call into question a finding that [D]efendant's statements were freely and voluntarily given." *See* Gov't's Mem. in Opp. at 11. Because the Court finds that Defendant made a voluntary, knowing, and intelligent waiver of his *Miranda* rights, the Court recommends that Defendant's motion to suppress his statements to Special Agent Gerten and Officer Dahmes be denied.

The Fifth Amendment requires that law enforcement inform a person of his or her rights under *Miranda v. Arizona*, 384 U.S. 436 (1966) before beginning a custodial interrogation. *United States v. New*, 491 F.3d 369, 373 (8th Cir. 2007). A defendant may waive his or her *Miranda* rights, provided that the defendant does so voluntarily, knowingly, and intelligently. *United States v. Gallardo*, 495 F.3d 982, 990 (8th Cir. 2007). The inquiry into a *Miranda* waiver has two parts: (1) "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception"; and (2) "the waiver must have been made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). "Only if the

'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id.* (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)). The burden is on the Government to show the waiver was valid by a preponderance of the evidence. *United States v. Black Bear*, 422 F.3d 658, 663 (8th Cir. 2005).

A *Miranda* waiver is made voluntarily only if "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *see also New*, 491 F.3d at 374 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)); *accord United States v. Vinton*, 631 F.3d 476, 482 (8th Cir. 2011). "A statement is not considered involuntary unless the police extorted it from the accused by means of coercive activity." *Vinton*, 631 F.3d at 482 (quotation omitted); *accord Colorado v. Connelly*, 479 U.S. 157, 167 (1986) ("[C]oercive police activity is a necessary predicate to . . . finding that a confession is not 'voluntary.'"); *New*, 491 F.3d at 374 ("Our cases hold that a confession may not be found involuntary absent some type of coercive activity on the part of law enforcement officials.") (quotation omitted). "In order to determine whether a confession was voluntary, [courts] look to the totality of the circumstances and must determine whether the individual's will was overborne." *United States v. Gaddy*, 532 F.3d 783, 788 (8th Cir. 2008) (quotation omitted). Courts look to whether the statement was "extracted by threats, violence, or direct or implied promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired." *United States v. Sanchez*, 614 F.3d 876, 883 (8th Cir. 2010) (internal

quotations and citations omitted).

Here, there is no evidence that Special Agent Gerten or Officer Dahmes coerced Defendant into making his statements or that his decision to speak with them was the product of anything other than a free and unconstrained choice. First, nothing in the record indicates that the environment in which the interview occurred, a typical jail interview room, was inherently coercive. The officers were not armed during the interview, and the interview lasted only about an hour and was therefore not coercive in its duration. *See, e.g., Makes Room*, 49 F.3d at 415 (finding that interrogation lasting over two hours was not coercive in duration); *Sumpter v. Nix*, 863 F.2d 563, 565 (8th Cir. 1988) (finding that interrogation lasting seven-and-a-half hours was not coercive in duration). Additionally, Special Agent Gerten testified credibly that Defendant never complained about being uncomfortable in the location of the interview. Though Special Agent Gerten could not recall whether Defendant asked for water or stated that he needed to go to the bathroom, she testified credibly that she would have granted him such permission if he would have asked. And while there is no recording of the interview, there is nothing in the record that indicates that the officers made any threats or promises to Defendant. *See United States v. Beaulieu*, No. 20-cr-235 (ECT/LIB), 2021 WL 3813317, at *5 (D. Minn. July 21, 2021) (concluding that the totality of the circumstances did not indicate that the defendant's will was overborne where the interview was conducted in a conversational tone and the interviewers made no threats or promises to the defendant), *report and recommendation adopted*, 2021 WL 3809927 (D. Minn. Aug. 26, 2021); *see also United States v. Makes Room*, 49 F.3d 410, 415 (8th Cir. 1995) (finding no coercive tactics where, among other

things, "[n]o threats or promises were made").  Moreover, Special Agent Gerten testified credibly that Defendant responded to the officers' questions with appropriate answers that made sense, there was nothing out of the ordinary about his demeanor, and he did not appear to be under the influence of anything.  *See Beaulieu*, 2021 WL 3813317, at \*5.  In sum, there is nothing in the record that demonstrates that Defendant was coerced into making his statement.  *See Vinton*, 631 F.3d at 482 ("There is no credible evidence that the police coerced [Defendant] into making the statements, or that his decision to speak with them was the product of anything other than a free and unconstrained choice.").  As such, the Court finds that Defendant's *Miranda* waiver was voluntary.

The Court must also determine whether Defendant's *Miranda* waiver was knowing and intelligent.  It is not enough that the Government "establishes that a *Miranda* warning was given and the accused made an uncoerced statement. . . . The [Government] must make the additional showing that the accused understood these rights."  *Berghuis*, 560 U.S. at 384.  "To make a knowing and intelligent waiver, the defendant must have 'full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'"  *Gallardo*, 495 F.3d at 990 (quoting *Moran*, 475 U.S. at 421).  Whether a waiver is knowing and intelligent is based on the totality of the circumstances.  *Id*. at 990-91.

There is no evidence that Defendant did not understand his *Miranda* rights.  *See Berghuis*, 560 U.S. a 382-83; *Gallardo*, 495 F.3d at 990.  Special Agent Gerten used a Spanish interpreter to communicate with Defendant, and the Court credits her testimony that there did not seem to be any communication issues.  Special Agent Gerten testified

credibly that she read Defendant his *Miranda* rights, he stated verbally that he understood his rights and was willing to answer some questions, and there was no confusion about Defendant's *Miranda* rights.  The Court also credits Special Agent Gerten's testimony that she very likely gave Defendant a copy of the *Miranda* rights written in Spanish to read because it is her common practice to do so.  While Special Agent Gerten did not have Defendant sign a written *Miranda* waiver, this was not required.  *See, e.g., United States v. Duran*, 109 F.Supp.3d 1093, 1104 (D. Minn. 2015) ("[A] waiver can be made orally or in writing; it need not assume any particular form.") (citing *United States v. Zamarripa*, 544 F.2d 978, 981 (8th Cir. 1976)).  According to Special Agent Gerten's credible testimony, Defendant seemed to follow and track the questions that were being asked, and his responses seemed to respond appropriately to what was being asked.  And, again, Special Agent Gerten testified credibly that Defendant responded to the officers' questions with appropriate answers that made sense, there was nothing out of the ordinary about his demeanor, he appeared to understand the nature of what was going on, and he did not appear to be under the influence of anything.  Based on the foregoing, the Court concludes that Defendant had full awareness of the nature of the rights being abandoned and the consequences of the decision to abandon it.  *See Gallardo*, 495 F.3d at 990.  Therefore, the Court finds that Defendant's *Miranda* waiver was knowing and intelligent.

In sum, the Court concludes that the Government has met its burden to prove that Defendant made a voluntary, knowing, and intelligent waiver of his *Miranda* rights. Accordingly, the Court recommends that Defendant's motion to suppress his statements to Special Agent Gerten and Officer Dahmes at the Scott County Jail on September 19, 2019,

be denied.

## IV. RECOMMENDATION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant's Pretrial Motion to Suppress Statements, Admissions, and Answers, ECF No. 22, be **DENIED IN PART** and **DENIED AS MOOT IN PART** as set forth herein:

1.    Defendant's motion to suppress statements to Trooper Mains before the drug detection canine alerted to the presence of narcotics on September 18, 2019, be **DENIED**;

2.    Defendant's motion to suppress statements to Trooper Mains after the drug detection canine alerted to the presence of narcotics on September 18, 2019, be **DENIED AS MOOT**; and

3.    Defendant's motion to suppress statements to Special Agent Gerten and Officer Dahmes at the Scott County Jail on September 19, 2019, be **DENIED**.

Date: May ___22___, 2023                                              _____*s/Tony N. Leung*_____
                                                                                   Tony N. Leung
                                                                                   United States Magistrate Judge
                                                                                   District of Minnesota

                                                                                   *United States v. Chavez-Torres*
                                                                                   Case No. 22-cr-150 (DWF/TNL)

## NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those

objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:**  This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.